**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FRONT ROYAL AND WARREN COUNTY
INDUSTRIAL PARK CORPORATION, a
Virginia Corporation,
<u>Plaintiff-Appellee,</u>

v.

TOWN OF FRONT ROYAL, VIRGINIA, a
Municipal Corporation; JOHN
MARLOW, Individually and as former
Mayor of the Town of Front Royal,
Virginia; MICHAEL KITTS,
Individually and as a member of the
Town Council of the Town of Front
Royal, Virginia; EDWIN L. POMEROY,
Individually and as a former

member of the Town Council of the
Town of Front Royal, Virginia;
ALBERT G. RUFF, JR., Individually
and as a former member of the
Town Council of the Town of Front
Royal, Virginia; GEORGE E. BANKS,
Individually and as a former
member of the Town Council of the
Town of Front Royal, Virginia;
BRACKENRIDGE H. BENTLEY,
Individually and as former Town
Manager of the Town of Front
Royal, Virginia,
<u>Defendants-Appellants.</u>

No. 96-1614

Appeal from the United States District Court
for the Western District of Virginia, at Harrisonburg.
James H. Michael, Jr., Senior District Judge.
(CA-87-19-H)

Argued: October 31, 1996

Decided: January 23, 1998

Before RUSSELL, ERVIN, and WILKINS, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Ervin wrote the opinion, in which Judge Russell joined. Judge Wilkins wrote an opinion concurring in the judgment.

_____

## COUNSEL

**ARGUED:** Glenn M. Hodge, WHARTON, ALDHIZER & WEAVER, P.L.C., Harrisonburg, Virginia, for Appellants. Robert Clayton Fitzgerald, HAZEL & THOMAS, P.C., Falls Church, Virginia, for Appellee. **ON BRIEF:** Mark D. Obenshain, WHARTON, ALDHIZER & WEAVER, P.L.C., Harrisonburg, Virginia, for Appellants. Myron C. Smith, Fairfax, Virginia, for Appellee.

_____

## OPINION

ERVIN, Circuit Judge:

Defendants-Appellants Town of Front Royal, Virginia (Town) and various individuals currently or previously associated with the Town's governance appeal from an order reinstating a prior summary judgment order and awarding recalculated damages. That order was made pursuant to the district court's exercise of jurisdiction following state court proceedings after we ordered abstention according to the doctrine promulgated in Burford v. Sun Oil Co. , 319 U.S. 315 (1943). The case initially arose from Plaintiff-Appellee Front Royal and Warren County Industrial Park Corporation's (IPC) 42 U.S.C. § 1983 action claiming an unconstitutional taking and violations of substantive due process and equal protection, predicated upon the appellants'

2

failure to construct sewer lines to IPC's lots as mandated by the 1978 Virginia Annexation Court. We reverse.

I.

We are very familiar with the factual background underlying this action and will not recite it in full yet again. Suffice it to say, IPC owns 86 acres of land, purchased in 1973 and 1974, that were annexed by the Town in 1978 pursuant to the order of a Virginia Annexation Court. That order also directed the Town to provide sewer service to IPC's lots by December 31, 1983, later extended two years, which the Town failed to do. After various legal wranglings, IPC filed the instant case in federal district court on February 12, 1987, alleging that the failure to provide sewer service violated its rights under the Fifth and Fourteenth Amendments.

The last time IPC was before us, we vacated, on the basis of Burford abstention, the district court's orders granting summary judgment and damages to IPC.[1] Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, 945 F.2d 760 (4th Cir. 1991) (hereinafter Front Royal V), cert. denied, 503 U.S. 937 (1992).[2] We instructed the district court to retain jurisdiction pending the outcome of state court proceedings. In particular, we envisioned that IPC should seek whatever remedy was appropriate under Virginia's Annexation Court scheme as well as whatever other state remedies might be available, suggesting a common law cause of action to vindicate the due process rights afforded under the Virginia Constitution, Art. I, § 11 to those who have been unlawfully deprived of their property. Id. at 764-65.

_____

[1] IPC's case was consolidated with a companion case filed the same day by Fred and Gladys McLaughlin, McLaughlin v. Town of Front Royal, No. CA-87-00020 (W.D. Va. filed Feb. 12, 1987), individual owners of property annexed by the Town but similarly not provided with sewer service. Fred McLaughlin was the sole shareholder of IPC.
[2] Although we previously labeled the various decisions in this lengthy litigation differently, to avoid further confusion we adopt the district court's nomenclature in denominating our most recent decision Front Royal V and continue the numbering from there.

3

IPC subsequently requested both the Town and the County of Warren to reconvene the Annexation Court, and, when that apparently failed, it sought relief in the state court system. The Circuit Court of Warren County did grant a writ of mandamus to compel the Town to extend sewer lines to each of IPC's lots, but it refused to award damages under state law. See Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 92-121, slip op. at 14 (Warren County, Va., Cir. Ct. Apr. 14, 1993); Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 92-121 (Warren County, Va., Cir. Ct. June 30, 1993) (letter ruling). The Supreme Court of Virginia affirmed the grant of mandamus, see Town of Front Royal v. Front Royal and Warren County Indus. Park Corp., 449 S.E. 794 (Va. 1994) (Front Royal VI), but it refused to accept appeal on the question of damages, see Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 931649 (Va. Mar. 4, 1994).

IPC thereafter moved the district court to reinstate its prior judgment and amend the previous award of damages and attorney's fees. In a published opinion, see 922 F. Supp. 1131 (W.D. Va. 1996) (Front Royal VII), the district court granted IPC's motion and, following the completion of the sewer lines by the Town, now awards IPC damages of $359,441.47 and attorney's fees of $105,317.19.

This appeal naturally followed, and thus the opportunity for Front Royal VIII.

II.

IPC originally filed this action pursuant to 42 U.S.C. § 1983. Federal court jurisdiction to hear § 1983 cases exists under the general federal question jurisdiction statute, 28 U.S.C.§ 1331. This appeal arises from a final order below, and we nominally possess appellate jurisdiction under 28 U.S.C. § 1291.

Normally, that would end our jurisdictional inquiry, but this is far from a normal case. Because we previously ordered Burford abstention, but directed the district court to retain federal jurisdiction, we believe it is necessary to address whether federal jurisdiction remains given the events and court dispositions that have transpired in the interim.

4

A.

As we recognized in Front Royal V, "[a]t the heart of the case before us is the question whether Front Royal ever complied with the orders of the Annexation Courts. The answer requires interpretation of the Annexation Courts' orders, which is a determination that the Annexation Court was uniquely qualified to make." Front Royal V, 945 F.2d at 764. We suggested that, although ten years had run, perhaps the 1978 Annexation Court could be reconvened under the special circumstances of this case. Id. at 764 n.*. The statute granting an Annexation Court a ten-year existence by its own terms permits the court to be

> reconvened at any time during the ten-year period on its own motion, or on motion of the governing body of the county, or of the city or town, or on petition of not less than fifty registered voters or property owners in the area annexed; provided, however, if the area annexed contains less than 100 registered voters or property owners, then a majority of such registered voters or property owners may petition for the reconvening of the court.

Va. Code Ann. § 15.1-1047(b). By itself, then, IPC could have no standing to cause the Annexation Court to reconvene.

We decided Front Royal V on September 19, 1991. The very next day, a notice pursuant to Virginia Code § 8.01-335 was sent to the parties' counsel from the clerk of the Warren County Circuit Court that the matter of the annexation would be stricken from the court's docket on October 21, 1991. See J.A. at 899. The notice provided for an objection, which had to be returned five days prior to October 7. IPC's counsel did not sign the objection until December 11, 1991.

A few days before that, on December 6, 1991, IPC did request both the Town and the County of Warren to reconvene the Annexation Court, see J.A. at 896-98; neither acted on the request. Shortly thereafter, on January 21, 1992, Judge Wetsel of the Circuit Court of Warren County determined that the Annexation Court ceased to exist for lack of activity in the matter and removed the case from the docket. See J.A. at 900.

5

We think this unexplained delay of IPC's counsel in seeking to reconvene the Annexation Court raises a real question as to whether IPC zealously sought to vindicate its state remedies in accordance with our directive in Front Royal V. IPC would no doubt argue that even had the Annexation Court been reconvened, it was powerless to award IPC damages for appellants' refusal to comply with its order. See Br. of Appellee at 15. A reconvened annexation court is limited to enforcing the terms and conditions of its original decree, and it may not reconsider or rehear its prior orders. City of Portsmouth v. City of Chesapeake, 136 S.E.2d 817, 826 (Va. 1964). This view of the limited nature of the reconvened annexation court was reconfirmed ultimately by the Virginia Supreme Court in Front Royal VI, 449 S.E.2d at 797.

Notwithstanding this dissolution of the Annexation Court, however, IPC's failure to pursue a remedy there may be more fundamental than may at first appear. A sister statute expressly provides:

> Notwithstanding the provisions of § 15.1-1047, in the event a decision granting any motion or petition for annexation is subjected to collateral attack in any court, state or federal, the court created by § 15.1-1038 shall not be dissolved; or, if heretofore or hereafter dissolved at the time such attack is made or is pending, shall be revived. The court shall thereafter continue in existence until such time as all collateral issues have been resolved, and until one year thereafter, and shall have the same powers and duties as set out in § 15.1-1047. In addition, it shall have the power to fully implement any order or decision of any court of competent jurisdiction with respect to such collateral attack.

Va. Code Ann. § 15.1-1047.2 (emphasis added). This provision has apparently not been interpreted by any court in a published disposition. To the extent that the 1978 Annexation Court conditioned the annexation on the Town providing sewer lines to IPC's lots, this entire litigation may be seen as a collateral attack on that annexation order. That Annexation Court may thus be revived. No procedures are spelled out for its revival, but given that it will possess greater powers than a merely reconvened court where there has not been a collateral attack, revival might not be limited only to those methods of recon-

6

vening laid out in § 15.1-1047. How extensive these greater powers are is also unclear since they have never been interpreted by a court heretofore. The point, however, is that IPC, directed to pursue state remedies, failed to even test this provision.

B.

Although it remains unclear to what extent IPC's alleged injuries may have been remedied by recourse to the Annexation Court, it is still necessary to examine IPC's pursuit of other state remedies. Pursuant to Virginia Code § 15.1-1048, IPC sought a writ of mandamus to compel the Town to build the sewer lines and combined with it a prayer for damages. In an opinion of October 23, 1992, Judge Wetsel of the Circuit Court of Warren County concluded as a matter of law that IPC could proceed on both grounds and noted that monetary relief may be available through a declaratory judgment action, a constitutional takings action, a common law damage action to enforce the due process rights of the state constitution, and/or an inverse condemnation action. Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 92-121, slip op. at 10-11 (Warren County, Va., Cir. Ct. Oct. 23, 1992).

Judge Wetsel subsequently granted IPC the writ of mandamus on April 14, 1993, but stayed its issuance on May 10 and ordered IPC to

> file a Bill of Particulars setting forth the specific facts upon which it bases its claim for damages against the Town, which Bill of Particulars shall also be accompanied by written memorandum of authorities setting forth the specific right of action upon which the Petitioner seeks the recovery of damages from the Town, which memorandum of authorities shall set forth the prima facie elements of that right of action.

J.A. at 1094. IPC, in the Bill of Particulars, did seek damages "under the common law" as well as pursuant to 42 U.S.C.§ 1983. See J.A. at 1019-20. However, in its memorandum, IPC only discussed with regard to its common law claim whether such damages are precluded by seeking mandamus, see J.A. at 1023-26, a point on which the cir-

7

cuit court had already permitted IPC to proceed. Despite the state court's suggestions of statutory and case law avenues on which IPC might recover monetary relief, IPC simply failed to address them, nor did it "set forth the prima facie elements" of its common law right of action as it was directed to do. IPC even argued under its federal takings claim that it could not win an inverse condemnation claim under existing state law. See J.A. at 1026-27.

It is thus hardly surprising, then, that in a letter ruling of June 30, 1993, Judge Wetsel denied IPC's claim for damages under state law. In particular, he ruled that IPC could not recover damages on three different bases: (1) because there is no constitutional right to sewer service, its denial is the failure to confer a benefit, and thus there is no taking of IPC's property as contemplated by the Virginia Declaratory Judgment Act, the predicate for a right of action under Va. Code § 8.01-187; (2) because IPC was not denied use of its land or the right to sell it, there could be no unconstitutional taking, and "[n]o inverse condemnation action will lie in Virginia where the acts complained of are to confer a benefit upon the property"; and (3) because "no statutory authority exists under the general mandamus statute which will permit the plaintiffs to recover damages merely for the violation of the ministerial act giving rise to the mandamus action," any such damage claim must have an independent basis in law, which is apparently lacking in this case. Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 92-121, slip op. at 1-4 (Warren County, Va., Cir. Ct. June 30, 1993) (letter ruling). Despite IPC's failure to adequately argue the basis of its damage claim, the state court did consider, and reject, three of the four avenues that it had suggested IPC pursue eight months before. The one remaining avenue not explicitly rejected is the common law damage action to enforce the due process rights of Article I, section 11 of the Virginia Constitution which is precisely the remedy we recommended to IPC in Front Royal V, 945 F.2d at 765. However, this argument was implicitly rejected in (2) above where the court found there could be no unconstitutional taking on these facts. Moreover, Judge Wetsel was well aware that mandamus, which he had granted, would not lie unless "there is no other available specific and adequate remedy." Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 92-121, slip op. at 9 (Warren County, Va., Cir. Ct. Oct. 23, 1992)

8

(quoting Richmond, F. & P. R.R. Co. v. Fugate , 142 S.E.2d 546 (Va. 1965) (internal quotation marks omitted)).

As mentioned above, the Virginia Supreme Court heard appeal in Front Royal VI only on the issue of mandamus. It refused to grant appeal on IPC's damage claim, finding "no reversible error in the judgment complained of," Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 931649 (Va. Mar. 4, 1994), and it also denied a petition for rehearing of that refusal. See J.A. at 1070. IPC did argue in its petition for rehearing, but to no avail, that Judge Wetsel applied City of Virginia Beach v. Virginia Land Inv. Ass'n No. 1, 389 S.E.2d 312 (Va. 1990), which stands for the proposition that, to constitute a taking, the owner must be"deprived of all economically viable uses of its property," id. at 314 (emphasis added), in a manner contrary to that in Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). See J.A. at 1265-68. Therefore, the state circuit court decision denying IPC's state law damage claim is the law of the case. With regards to the nature of the mandamus remedy, the Virginia Supreme Court reiterated (twice) that the writ will issue only where "there is no adequate remedy at law," and, additionally, "where there is no other available specific and adequate remedy." Front Royal VI, 449 S.E.2d at 796 (internal quotation marks and citations omitted) (emphasis in original). This restatement of the law on mandamus, together with the refusal to hear the damages issue, must be taken by us as a firm statement by Virginia's highest court, in the posture with which that court was presented the matter, that IPC possessed no other state law remedy.

It is with this failure to succeed on its state law damage claim that IPC returned to federal district court to seek to have that court's prior judgment reinstated. The district court found that IPC's § 1983 action as predicated on a takings claim was now procedurally ripe, given that IPC had unsuccessfully utilized the state law procedures to seek monetary relief for the alleged taking, which is all that is required by Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 195 (1985). Front Royal VII, 922 F. Supp. at 1143-45. More particularly, the district court rejected appellants' contention that IPC had ignored its duty to pursue the state remedies. The court understood the Virginia Supreme Court's denial of IPC's petition to reconsider its takings jurisprudence as a reaffirmation of that jurisprudence

9

and thus believed that it would have been no more than a "futile and idle exercise" to require IPC "to argue a premise of law which the highest court of a jurisdiction has explicitly and unequivocally rejected." Id. at 1144 n.20 (citing Kinzli v. City of Santa Cruz, 818 F.2d 1449 (9th Cir.), amended by 830 F.2d 968 (9th Cir. 1987), cert. denied, 484 U.S. 1043 (1988)).

On the other hand, it certainly seems that some weight should be given to appellants' argument that IPC initially failed to properly claim or plead entitlement to relief under any potentially available state remedy. See Reply Br. of Appellants at 2. IPC simply did not follow the order of the state circuit court to present to that court the prima facie elements of its rights of action, nor did IPC even discuss the approaches for relief that that court had suggested to it. Appellants argue that, as a result of this failure, the order denying IPC's state law damage claim must be considered void. Id. (citing Patterson v. Anderson, 74 S.E.2d 195, 203 (Va.) ("A decree cannot be entered in the absence of pleadings upon which to found the same, and, if so entered, it is void." (internal quotation marks and citations omitted)), cert. denied, 345 U.S. 965 (1953). Patterson 's rule, however, applies where a judgment grants the relief sought in a defective pleading, not where the judgment denies the relief sought in the defective pleading.

Nevertheless, it strikes us as quite odd and improper that IPC should benefit, either surreptitiously or through bad lawyering, from its failure to vigorously pursue state remedies, in dereliction of the duty imposed by us, when all the while it knew there was a federal district court sympathetic to its claims. In addition, IPC's failure to test the powers of the revivable Annexation Court under Virginia Code § 15.1-1047.2 just doesn't sit well with us. In a previous case of Pullman abstention, we refused to allow appellants to return to fed-eral court where they had failed to timely perfect an appeal to the Vir-ginia Supreme Court, since to do so "would only encourage sloppy lawyering and disrespect for state procedure." National Capital Naturists, Inc. v. Board of Supervisors, 878 F.2d 128, 132 (4th Cir. 1989); cf. Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 16 n.16 (1987) (stating that "Texaco cannot escape Younger abstention by failing to assert its state remedies in a timely manner"). Here the affront is more egregious, for IPC only perfunctorily performed its duty to return to state court, thereby not only abusing the integrity of state law and pro-

10

cedure by failing to fully advocate its position, but also flouting our very purpose in ordering abstention in the first place. While it may be true now that IPC's state law damage claim amounts to a "futile and idle exercise," such was not the case when we abstained. We find that IPC was obliged to make a good faith effort to seek just compensation under state law. Failing to pursue a statutory avenue open to it and failing to follow a state court's order to present the prima facie elements of its rights of action do not a good faith effort make.

C.

Subsequent to our decision in Front Royal V, we held that normally in cases of Burford abstention the appropriate course is for the district court to dismiss the action altogether instead of retaining jurisdiction pending the state court proceedings. See Pomponio v. Fauquier County Bd. of Supervisors, 21 F.3d 1319, 1328 (4th Cir.) (en banc), cert. denied, 513 U.S. 870 (1994). In the unusual circumstances of this case, however, we instructed the district court to retain jurisdiction. In light of our decision in Pomponio and IPC's behavior in pursuing its state law damage claim, it would appear that IPC would deserve to have its case dismissed after all.

Since our decision in Pomponio, however, the Supreme Court has declared that dismissal, based on abstention principles, is appropriate only where the relief sought is equitable or otherwise discretionary. In damages actions, a federal court cannot dismiss the action but can enter a stay to await the conclusion of state proceedings. See Quackenbush v. Allstate Ins. Co., 135 L. Ed. 2d 1, 22 (1996). Quackenbush dealt with an action that sought neither equitable nor other discretionary relief that was dismissed under the Burford abstention doctrine. Although the Court did not so hold, it left open the possibility that "Burford might support a federal court's decision to postpone adjudication of a damages action pending the resolution by the state courts of a disputed question of state law." Id. Although not squarely before us, we note that Quackenbush appears to have implicitly overruled our holding on this issue in Pomponio, a damages action. At the same time, it appears that our earlier decision in this case in Front Royal V, viz. the instruction to the district court to retain federal jurisdiction, remains supportable under current abstention jurisprudence.

11

Because not before the Court, Quackenbush provides no guidance on appropriate federal court action when litigants who have been sent to state court pursuant to Burford return to the federal forum following the state court resolution of the state law questions. In cases of Pullman-type abstention, see Railroad Comm'n v. Pullman Co., 312 U.S. 496 (1941), litigants are not necessarily permitted to return to federal court, despite the stay order, if in state court they in fact litigated their federal claims and did not instead make an England reservation of their right to have a federal court disposition of the federal issues, see England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 419-22 (1964). See, e.g., Promovision Int'l Films, Ltd. v. Trapani, 744 F.2d 1063, 1064-65 & 1064 n.1 (4th Cir. 1984). Presumably, similar requirements are appropriate for return to federal court after Burford abstention.

Much more uncertain would be the intersection between an England-type reservation in the Burford abstention context and the ripeness requirement under Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985), for the existence of federal court subject matter jurisdiction for a claim predicated on the Takings Clause. In Williamson County, the Supreme Court held that a would-be § 1983 litigant's takings claim is not procedurally ripe until state avenues of compensation have been exhausted. Id. at 194-95 & 194 n.13. Williamson County would thus seem to presuppose that a would-be Takings Clause claimant would proceed first in state court and thus could never find itself, as IPC does here, in a situation in which it in fact went first to federal court and was from thence directed to state court, via Burford abstention. Nevertheless, Williamson County does not require that the federal takings claim actually be litigated in state court. Although we have not had much occasion to consider Williamson County's ripeness requirement, but see Naegele Outdoor Advertising, Inc. v. City of Durham, 844 F.2d 172, 174-75 (4th Cir. 1988), the Eleventh Circuit has determined, in a cogent analysis, that an England-type reservation may be made of a federal takings claim when a litigant proceeds first in state court pursuant to Williamson County. See Fields v. Sarasota Manatee Airport Auth., 953 F.2d 1299, 1303-07 (11th Cir. 1992). Should such an unusual posture as supposed here ever arise in the future, it would thus be meet for the district court to advise the parties that they may

12

wish to make an England-type reservation of their right to return to federal court, if need be, when they first appear in state court.

In our prior decisions in this litigation we never reached the merits of IPC's takings claim and thus never considered the preliminary question of whether that claim was ripe under Williamson County. Although we do not believe that IPC sought zealously to seek just compensation in the state court system, it appears now that its state remedies for just compensation have been exhausted, as the district court determined. As noted above, despite IPC's failure to follow the state circuit court's order to brief it on its rights of action for damages, the state circuit court did, in fact, consider--and reject--either expressly or implicitly each of IPC's possible rights of action for damages, and the Virginia Supreme Court refused to hear appeal on IPC's damage claim. We therefore see no clear basis under Williamson County to determine that IPC's takings claim is other than finally ripe for adjudication in a federal forum. **3**

Furthermore, ultimately, and unfortunately, we find we must agree with the district court that continued abstention at this point would be inappropriate. See Front Royal VII, 922 F. Supp. at 1138. Although IPC did attempt to litigate its federal claims in state court, which, had it succeeded at its attempt, would have barred its return to federal court under the principles of res judicata, the state circuit court expressly refused to entertain IPC's federal claims as a matter of comity.**4**

_____

**3** Absent is a similar concern with whether IPC's Fourteenth Amend-ment due process and equal protection claims are ripe. State remedies need not be exhausted in order to pursue a § 1983 action claiming a vio-lation of these federal rights. See Patsy v. Board of Regents, 457 U.S. 496 (1982).

**4** We note that IPC failed to make an express England-type reservation of its right to return to federal court. However, although IPC did, then, present its federal claims to the state court for disposition, those claims were not "fully litigated," as England requires, see England, 375 U.S. at 421-22, since the state circuit court refused to address them. In a case with a similarly odd procedural posture, the Third Circuit allowed the plaintiff to return to federal court following a Pullman-type abstention, which the court determined should actually have been abstention through Younger v. Harris, 401 U.S. 37 (1971). See Ivy Club v. Edwards, 943

13

See Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 92-121, slip op. at 3-4 (Warren County, Va., Cir. Ct. June 30, 1993) (letter ruling). This case has already passed through procedural purgatory and wended its way to procedural hell. Because we believe it would be fruitless and a waste of further judicial resources at this point to send IPC back again to state court to try its hand at a revived Annexation Court pursuant to Virginia Code § 15.1-1047.2, which is the only avenue open now since the other state law remedies have been foreclosed by the law of the case, an effective dismissal-via-abstention now would deprive IPC of its right to a federal forum. We take seriously our strict duty to exercise the jurisdiction that has been conferred upon us. See Quackenbush, 135 L. Ed. 2d at 12 (acknowledging that "federal courts have a strict duty to exercise the jurisdiction conferred upon them by Congress"); see also Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 821 (1976) (stating that "federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them"); Willcox v. Consolidated Gas Co., 212 U.S. 19, 40 (1909) ("When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction."). We emphatically state, however, that we do not condone IPC's failure to follow our mandate and that we exercise our jurisdiction in this instance only because the state circuit court expressly refused to reach the federal claims out of deference for the principles of comity and federalism. Cf. England, 375 U.S. at 421-22 (holding that a "litigant is in no event to be denied his return to the District Court unless it clearly appears that he voluntarily . . . fully litigated his federal claims in the state courts" (emphasis added)).

_____

F.2d 270 (3d Cir. 1991), cert. denied sub nom. Del Tufo v. Ivy Club, 503 U.S. 914 (1992). There the plaintiff had initially litigated its federal constitutional claims in state administrative proceedings, but after the district court abstained and upon return to state court, an express England reservation was made. In weighing the equities, the court was in part persuaded that, although the state courts had not explicitly acknowledged the plaintiff's England reservation, the state courts had not decided the federal constitutional claims. See id. at 281. We can see no warrant for finding a voluntary waiver of England-type rights where, although a reservation was not expressly made, the state court expressly refuses to reach the federal claims presented to it out of concerns for comity.

14

There appear to be no cases in which a Court of Appeals has denied a litigant the right to return to federal court where federal claims remained after a <u>Burford</u> abstention, nor any in which the litigant was denied the federal forum following any type of abstention where the litigant only half-heartedly complied with the mandate to pursue state law remedies. In other words, there is no doctrine of waiver immanent in the retention of federal jurisdiction, and we decline, even on these facts, to create one here. Moreover, our previous concerns that federal court involvement in Virginia's land-use regulation scheme could disrupt the development of coherent state policy in this arena have been rendered moot by the various intervening events and court dispositions. Thus, despite IPC's lack of good faith in fully advocating its claims in state court and as much as we may like to dismiss its case as a result, we determine that the district court below properly reached the merits, and so now must we.

III.

We review <u>de novo</u> the district court's order granting summary judgment to IPC. <u>See E.J. Sebastian Assocs. v. Resolution Trust Corp.</u>, 43 F.3d 106, 108 (4th Cir. 1994). We apply the same standards as the district court, i.e. summary judgment is appropriate where there is no genuine dispute as to a material fact. <u>See Miller v. FDIC</u>, 906 F.2d 972, 973-74 (4th Cir. 1990); Fed. R. Civ. P. 56(c).

We review the district court's findings of fact for clear error. <u>See Waters v. Gaston County, N.C.</u>, 57 F.3d 422, 425 (4th Cir. 1995); Fed. R. Civ. P. 52(a). "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." <u>Faulconer v. Commissioner</u>, 748 F.2d 890, 895 (4th Cir. 1984).

IV.

The district court granted IPC's motion for summary judgment on its takings, substantive due process, and equal protection claims. Although the district court's legal analysis was thorough and generally sound, we find in our <u>de novo</u> review, in each case, either that

15

the district court's analysis stopped short or that we cannot agree with the lower court's application of the law to the facts here.

Given our disposition of this case, we do not address the issue of the qualified immunity of the individual government officials. Although we have cited approvingly the proposition advanced by the lower court--that an official acting ultra vires may not claim qualified immunity, see In re Allen, 106 F.3d 582, 590 (4th Cir. 1997) (citing, inter alia, Front Royal VII, 922 F. Supp. at 1142)--we will not pass on whether in the case sub judice that proposition was properly applied. In any event, that issue has been rendered moot by the litigation history of this case. Although the individual officials still appear in the caption as defendants-appellants, only the Town's liability remains at stake. When IPC returned to state court, it sued only the Town, not the individual officials. The state circuit court concluded as a matter of law that the individuals were not parties to the suit, which is now the law of the case. See Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 92-121, slip op. at 11-12 (Warren County, Va., Cir. Ct. Oct. 23, 1992). IPC is thus precluded from seeking to attach liability to these individuals now.

Although IPC's first amended complaint was ambiguous as to the nature of its due process claim, the district court interpreted the complaint as seeking relief under a substantive due process theory. We agree and thus we will not consider IPC's claim on the basis of a procedural due process theory.

We turn now to address each of IPC's claims serially.

A.

In Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), the Supreme Court noted that there exist at least two distinct categories of governmental regulatory action that may result in a taking for which just compensation is due under the Fifth Amendment. First, regulations that compel a physical invasion of an owner's property are takings, no matter how slight the invasion or how weighty the public interest advanced to support them. Id. at 1015. See, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) (holding that cable facilities occupying only 1.5 cubic feet constituted a tak-

16

ing). Second, regulations that deny "all economically beneficial or productive use of land" are compensable takings. Lucas, 505 U.S. at 1015. See, e.g., Nollan v. California Coastal Comm'n, 483 U.S. 825 (1987); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987). Despite these categorizations, much remains uncertain about takings jurisprudence, for the Court admitted that there is no "set formula" for determining when a regulation goes "too far" and becomes a compensable taking. Lucas, 505 U.S. at 1015. Although the categories themselves provide guidance, the difficulty is determining on an ad hoc basis whether any particular regulation fits neatly, or otherwise, into one of these two categories.

Surveying this jurisprudence from a different perspective, it is clear that a taking exists where the owner of real property is forced to "sacrifice all economically beneficial uses . . ., that is, to leave his property economically idle." Lucas, 505 U.S. at 1019 (emphasis in original). It is also clear that temporary, but total, regulatory takings are compensable. See First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 321 (1987). It is unanswered and much less clear, although arguable, that a partial regulatory taking may be compensable. However, under this jurisprudence we can see absolutely no warrant for the proposition that where the government does not affirmatively prohibit the realization of investment-backed expectations, but merely refuses to enhance the value of real property, a compensable taking has occurred. We must seriously question the nature of IPC's claimed property interest that has allegedly been taken. This property interest is nothing but an inchoate interest in the conferral of a benefit to enhance market value. To find it to be a compensable taking would open an incredible Pandora's Box. Even were such an inchoate interest a stick in the bundle of property rights, it is clearly not one of the classical property rights of possession, use, and disposition. See Kaiser Aetna v. United States , 444 U.S. 164, 176 (1979) (speaking in terms of the "sticks in the bundle of rights that are commonly characterized as property"); Loretto, 458 U.S. at 435 (describing property rights as "the rights to possess, use and dispose of [a thing]" (internal quotation marks and citation omitted)).

The instant case is not like Lucas, where new zoning regulations totally prevented the owner from building any habitable structure on the beachfront lots, thereby denying his investment-backed expecta-

17

tions. The district court's argument that alternative uses of the property, such as a residential subdivision, were "neither economically realistic nor realistically available," Front Royal VII, 922 F. Supp. at 1149, is simply not probative.**5** What IPC and the district court fail to recognize is that the government did not do anything to deny IPC the right to use its property for an industrial park. The Town had already installed a pump on lot 14 and certain interceptor lines. All that remained to do was to connect collector lines to thirteen of the sixteen lots. Absolutely no government regulation prevented IPC from installing those lines itself. In fact, many developers do install their own sewer lines. Admittedly, the Town was under an Annexation Court order to install those lines, but nothing prevented IPC from doing so and then suing the Town for recovery of those costs.

In any event, it is painfully obvious that the Town's failure to install the sewer lines did not deprive IPC's land of all economic value or even close to that. The district court determined that IPC's basis in the property was $407,000 (comprised of the $107,000 purchase price plus the "approximately $300,000" spent in preparing the land for use as an industrial park). See Front Royal VII, 922 F. Supp. at 1134-35. The fair market value of IPC's land without sewer service was $405,000. See id. at 1152. The math is simple. The outright diminution in value is less than one half of one percent. Even if the diminution be calculated from the fair market value of the land with the sewer service provided, which the district court determined to be $810,000, see id., the reduction is still only 50 percent. Not all regulatory deprivations amount to regulatory takings, and a regulatory deprivation that causes land to have "less value" does not necessarily make it "valueless."

Although not central to our determination, two additional aspects touched upon in Lucas support our decision. In discussing the "property interest" against which the loss of value is to be measured, the

_____

**5** Moreover, the district court ignores the fact, as several Justices in Lucas noted, that even where the only residual economic uses of land are recreational, such as camping or picnicking, economic value still remains. See Lucas, 505 U.S. at 1044 (Blackmun, J., dissenting); id. at 1065 n.3 (Stevens, J., dissenting). Cf. id. at 1026 n.13 (citing cases where other uses remained).

18

Court noted the unsettled distinction between a regulatory deprivation of all economically beneficial use of the burdened portion of a tract and a deprivation that results in the mere diminution in value of the tract as a whole. Lucas, 505 U.S. at 1016 n.7. The Court suggested, but did not decide, that the difficulties inhering in this distinction may be resolved by "how the owner's reasonable expectations have been shaped by the State's law of property--i.e., whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value." Id. In this particular case, IPC had no reasonable expectation that Virginia's property law would recognize, let alone protect, a property interest in having sewer service provided by government. As the state circuit court held under Virginia law, and as IPC even argued before it, because there is "no constitutional right to sewer service," the Town's "failure to confer a benefit on the property which [IPC] alleges would substantially enhance the value of its property" cannot be a taking. Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, No. 92-121, slip op. at 2 (Warren County, Va., Cir. Ct. June 30, 1993); see also City of Virginia Beach v. Virginia Land Inv. Ass'n No. 1, 389 S.E.2d 312, 314 (Va. 1990). IPC's property interest thus falls on the side of the distinction, noted above, of those regulatory deprivations that result in the mere diminution in value of the tract as a whole and for which compensation is not due.

The Lucas Court also suggested that government could not sustain a confiscatory regulation that denies all economically beneficial use, without just compensation, unless the limitations effected by the regulation were already inherent in the title itself. Lucas, 505 U.S. at 1027, 1029. In other words, an owner cannot be prohibited a use, without compensation, where her title did not already contain an "implied limitation" on that use. Analogizing to the instant case, when IPC purchased its land in 1973 and 1974 and acquired its title, before annexation by the Town, it had no legitimate expectation that that land came with the public provision of sewer service. Instead, inherent in that title was the implied limitation that the owner would have to provide for its own water and sanitary waste disposal. This same factual basis also supports the conclusion that IPC did not suffer the defeat of its investment-backed expectations. When IPC purchased the land in 1973 and 1974, that investment could not have been

19

backed by the expectation that its land would be provided with public sewer service.

It cannot be gainsaid that the Town's and its officials' behavior in this matter has been less than honorable. Not only did they fail to provide the mandated sewer service until nearly ten years after the Annexation Court-imposed deadline, but they affirmatively developed their own industrial park across the road from IPC's property and provided it with sewer service. As unfortunate as the appellants' behavior has been, however, it simply does not constitute a taking under federal constitutional law. This is precisely why, under the circumstances of this case, we left it to the state court system to mete out the appropriate remedy for appellants' long-standing refusal to supply the sewer lines. Despite the character of the governmental action in this instance, the economic impact of the deprivation of the sewer service has been relatively minimal, and certainly very far from total. Moreover, that deprivation has not affirmatively interfered with IPC's distinct investment-backed expectations. See Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25 (1986) (identifying factors to be assessed in determining, ad hoc, whether a regulation goes "too far" and becomes a compensable taking). IPC's original investment could not have contemplated the public provision of sewer service, and it could have fulfilled its later expectations by providing its own sewer lines. Because IPC's property interest is at best an inchoate interest in the conferral of a benefit to enhance market value, and not like one of the traditional sticks in the bundle of property rights, we will not open the lid to Pandora's Box into a virtual terra incognito where we cannot stand on something more like terra firma .

B.

The Town claims that the district court granted summary judgment on a substantive due process claim essentially sua sponte. However, IPC's first amended complaint does state that it has been denied its property without due process of law in violation of the Fourteenth Amendment. The district court interpreted this as a substantive due process claim, and we cannot see how the Town has been prejudiced by the lower court addressing it as such since the complaint fairly puts the Town on notice.

20

As we have noted, however, substantive due process is a substantially narrower concept than procedural due process, for it serves as "an absolute check on certain governmental actions <u>notwithstanding</u> the fairness of the procedures" used to implement those actions. <u>Love v. Pepersack</u>, 47 F.3d 120, 122 (4th Cir.) (internal quotation marks and citation omitted) (emphasis added), <u>cert. denied</u>, 116 S. Ct. 64 (1995). We have determined that this absolute check is warranted only where <u>no process</u> could cure the deficiencies in the governmental action. <u>See Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 827 (4th Cir. 1995). In other words, governmental action offends substantive due process only where the resulting deprivation of life, liberty, or property is so unjust that no amount of fair procedure can rectify it. <u>See Love</u>, 47 F.3d at 123. As we stated in <u>Rucker v. Harford County, Md.</u>, 946 F.2d 278, 281 (4th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1097 (1992):

> [T]he residual protections of "substantive due process" in this (or any) context run only to state action so arbitrary or irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation remedies.

In <u>Sylvia Development</u>, we broke down a substantive due process claim into three elements that a claimant must prove under this narrow conception when the property prong of the Fourteenth Amendment is implicated: (1) the claimant must establish possession of a property interest, (2) state action must deprive the claimant of the property interest, and (3) the state's action must fall "so far beyond the outer limits of legitimate governmental action that <u>no process</u> could cure the deficiency." <u>Sylvia Dev.</u>, 48 F.3d at 827 (emphasis in original). In <u>Gardner v. City of Baltimore Mayor and City Council</u>, 969 F.2d 63, 68 (4th Cir. 1992), we permitted the Supreme Court's standard of "claim of entitlement" under <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972), to satisfy the property interest element in a substantive due process challenge.

In the instant case, the district court determined that under our holding in <u>Gardner</u> IPC possessed a property interest because it fairly had a claim of entitlement to the sewer lines since the Town lacked

21

all discretion to totally deny them. See Front Royal VII, 922 F. Supp. at 1149-51. It is certainly plain that the Virginia Supreme Court determined that the 1978 Annexation Court's decree required the Town "to perform a prospective non-discretionary act." Front Royal VI, 449 S.E.2d at 798.

However it may be that the Town lacked discretion, that IPC had a claim of entitlement, and that the Town deprived IPC of that entitlement, it is equally plain that the Virginia Supreme Court remedied that deprivation by affirming the trial court's issuance of a writ of mandamus. See id. Pursuant to that writ, the sewer lines were constructed. Thus even if IPC has satisfied the first two elements of its substantive due process claim, it cannot satisfy the third. Because the state courts ordered the Town to construct the sewer lines, the state courts were capable of rectifying, and did rectify, the Town's dereliction.

As in Sylvia Development, our analysis in no manner condones the Town's actions in circumventing its legal obligations for nearly ten years. Cf. Sylvia Dev., 48 F.3d at 829 ("Our analysis should not be interpreted as condoning the actions of public officials who circumvent legally established criteria in their decisionmaking."). But governmental actions that are violative of state law are properly challenged in state courts which exist, in part, to protect citizens from abuses of state law. See id.; Love, 47 F.3d at 123. Whether the Town illegally refused to comply with the Annexation Court's decree is not determinative of whether federal substantive due process has been violated. As we stated in Love:

> We would trivialize the Due Process Clause to invoke it every time the citizen defeats the state in state court. The Clause is violated only where the state courts can do nothing to rectify the injury that the state has already arbitrarily inflicted.

Id. Had IPC not rushed into federal court in the first place but instead gone to state court, as it only did after we ordered it to following our abstention decision in Front Royal V, no doubt its sewer lines would have been constructed much sooner. Federal court is not the automatic cure for whatever ails one.

C.

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As we have recently stated, the Clause "limits all state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995) (emphasis in original).

IPC's equal protection claim is not a challenge to any Town ordinance or regulation or even to any state law. Indeed, IPC's claim specifically rests on the validity of the 1978 Annexation Court's decree. Instead, IPC is claiming a violation of federal constitutional law through the Town's refusal to properly administer or comply with that state Annexation Court order.

The Equal Protection Clause forbids both laws that expressly discriminate as to classifications that bear no appropriate relationship between the legislative purpose and the classification adopted to achieve that purpose and laws that are facially neutral but that are administered or enforced discriminatorily with regard to such classifications.

In ruling on the motion for summary judgment with respect to IPC's equal protection claim, the district court noted that the Town officials alleged in their affidavits "that they based their decision not to extend the sewer lines on the sort of garden-variety economic factors which courts historically conclude merit judicial deference." Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, Va., 708 F. Supp. 1477, 1486 (W.D. Va. 1989). The district court ruled, however, that this reason was legally insufficient inasmuch as the extension of sewer service had been ordered by the annexation court. See id. Discussing IPC's additional claim "that there was a conspiracy among the defendants to provide sewerage to certain parcels for personal benefit and to deny it to plaintiffs," the district court evinced its correct understanding of its authority under Rule 56(c) in writing:

23

While there is some evidence that this may have been so, the record does not provide the basis for a finding, under Rule 56, that there was invidious discrimination by defendants against plaintiffs because there are disputes regarding issues of material fact which relate to defendants' motivation in providing sewers and the effect of providing the sewer lines to some parcels and not to others. However, it is not necessary to find uncontroverted evidence of a conspiracy by defendants to reduce the value of plaintiffs' parcels or to impermissibly deny to plaintiffs sewer service, for defendants themselves have not been able to identify any permissible state interest to which defendants' decision could bear a rational relationship nor could there feasibly be any such interest, given the strictures placed upon defendants by the annexation orders.

Id. at 1487. This statement is not a "finding" that there was no invidious discrimination. Instead, it is a legal conclusion that although evidence concerning the existence of invidious discrimination was conflicting, foreclosing judgment under Rule 56(c), judgment nevertheless was proper for IPC because, as a matter of law, there was no legitimate state interest in denying sewer service. This legal conclusion by the district court, however, is unsound.

Hence, the district court erred in granting summary judgment to IPC. It appears to be undisputed that, whether one accepts IPC's claim that the decision not to provide sewer service to its property was made to advance the interests of nearby property owned by the Town or the Town officials' contention that the decision was strictly an economic one, the different treatment of IPC's property was intentional. See, e.g., Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 819 (4th Cir. 1995) (explaining that in order"[t]o prove that a statute has been administered or enforced discriminatorily, more must be shown than the fact that a benefit was denied to one person while conferred on another" and that "[a] violation is established only if the plaintiff can prove that the state intended to discriminate"). And, because the governmental action did not burden a fundamental right or employ a suspect classification, the pertinent question for determining whether the governmental action violated the Equal Protection Clause is whether the Town officials reasonably could have believed

24

that the action was rationally related to a legitimate governmental interest. See, e.g., Plyler v. Moore, 100 F.3d 365, 373 (4th Cir. 1996), cert. denied, 117 S. Ct. 2460 (1997); Chambers Med. Techs. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1262-63 (4th Cir. 1995); Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel, 20 F.3d 1311, 1320 (4th Cir. 1994). Regardless of the actual motivation for the decision to provide sewer service to adjacent property but not to IPC's property, the Town officials reasonably could have believed that the decision was rationally related to a legitimate governmental interest. Therefore, the district court erred in granting summary judgment to IPC.

## V.

For the foregoing reasons, we conclude that IPC's takings, substantive due process, and equal protection claims pursuant to the Fifth and Fourteenth Amendments cannot be sustained. We therefore reverse the grant of summary judgment to IPC on each of these claims and direct the district court to dismiss them. Our disposition necessarily reverses the award to IPC of compensatory damages and attorney's fees. We remand this matter to the district court for whatever proceedings may remain in this now too-lengthy litigation.

REVERSED AND REMANDED

WILKINS, Circuit Judge, concurring in judgment:

I am in full agreement with the result reached by the majority-- reversal of the decision of the district court holding that the actions of the Town of Front Royal, Virginia and several of its individual officials effected an unconstitutional taking of property belonging to the Front Royal and Warren County Industrial Park Corporation (IPC) and violated the due process and equal protection guarantees of the Fourteenth Amendment. I write separately to highlight the dictum in the majority opinion that has resulted from the unnecessary breadth of its discussion and its consideration of a number of matters that I believe are irrelevant to the decision.

Section II of the majority opinion explains that we held in a prior appeal in this litigation that abstention pursuant to Burford v. Sun Oil

25

Co., 319 U.S. 315 (1943), was appropriate and directed the district court to retain jurisdiction "pending the outcome of the state proceedings because they may not fully dispose of all of the federal claims." Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, Va., 945 F.2d 760, 765 (4th Cir. 1991). The majority also notes that IPC subsequently obtained a ruling from the Supreme Court of Virginia that the state trial court properly granted mandamus relief because IPC possessed "a clear right to the" construction of sewer lines under the 1978 annexation court order, the Town had "a legal duty to perform the act" that IPC sought to compel, and "there [was] no other available specific and adequate remedy." Town of Front Royal v. Front Royal & Warren County Indus. Park Corp., 449 S.E.2d 794, 796-98 (Va. 1994) (internal quotation marks omitted). The majority eventually reasons that in view of our prior direction that the district court was to retain jurisdiction to consider the federal issues if the state court did not resolve them, the determination of the Supreme Court of Virginia that no state remedy other than mandamus was available to IPC, and the ruling of the state court that prudential considerations counseled against a decision on the federal issues, the district court correctly held that it was appropriate to proceed to resolve the federal questions. The remainder of the discussion in Section II is unnecessary to the decision and, hence, is dicta.

Next, as the majority correctly notes in Section IV, our conclusion that none of IPC's constitutional rights were violated obviates the need to address the question of whether the individual defendants are entitled to qualified immunity. See DiMeglio v. Haines, 45 F.3d 790, 799 (4th Cir. 1995) (noting that a court may dispose of a case on the ground that no constitutional violation occurred without addressing qualified immunity). The remainder of the paragraph discussing qualified immunity is dicta.

Finally, the majority intimates that the "inchoate interest in the conferral of a benefit to enhance market value" may not give rise to an unconstitutional taking. Slip op. at 17. Obviously, this reasoning is unnecessary to the decision since the majority concludes that no unconstitutional taking resulted because the "failure to install the sewer lines did not deprive IPC's land of all economic value or even close to that." Slip op. at 18 (emphasis omitted). Again, the balance of the Fifth Amendment discussion must be understood to be dicta.

26